## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

BRANDON KULHANEK,  )
 )
           Plaintiff,  )
 )     No. 4:17-CV-02431-JAR
    v.  )
 )
CINDY GRIFFITH, et al.,  )
 )
           Defendants.  )

## MEMORANDUM AND ORDER

This matter is before the Court on Defendants' Motion for Summary Judgment.[1]  (Doc. No. 53).  The motion is fully briefed and ready for disposition.  For the following reasons, Defendants' motion will be granted.

### I.     Background

Plaintiff Brandon Kulhanek ("Plaintiff"), proceeding  pro se, brings this action for monetary damages[2] pursuant to 42 U.S.C. § 1983 against Defendants Cindy Griffith, Greg Dunn, Rick Menteer, and Will Hunter in their individual capacities.[3]  Plaintiff is a Missouri inmate who,

---

[1] Defendants motion was originally styled as a motion for judgment on the pleadings.  After considering both Defendants' motion and Plaintiff's response, the Court determined that both parties made arguments that relied on matters outside of the pleadings.  Because the parties relied on evidence beyond the scope of the complaint, the Court converted Defendants' motion for judgment on the pleadings to a motion for summary judgment.  The Court gave Defendants thirty days to supplement their motion and gave Plaintiff thirty days to file any supplemental response.  (Doc. No. 62).

[2] When the complaint was originally filed, Plaintiff also sought injunctive relief that would prevent Defendants from engaging in the alleged wrongful activity.  This request is moot as Plaintiff is no longer confined in the same prison as Defendants.  (*See* Doc. No. 60 (giving notice to the Court that Plaintiff is now confined at South Central Correctional Center)).

[3] On January 23, 2018, the Court dismissed Ian Wallace, Alan Earls, Eric Burch, Joe Arcand, William Milam, Travis Crews, Stan Payne, Jennifer Price, Bruce Dunn, Vincent Cain, Donald Walcott, Robert McMahan, Unknown Batiste, Unknown Nichols, Unknown Declue, Unknown King, Unknown Klein, Unknown Sistry, Unknown Lee, Unknown Renshaw, Unknown Isgrig, Unknown Stegall, Unknown Hand, Jason Davis, Amber Rayfield, Kimberly Price, Christina Henson, Frederick Knapp, Patrick Brauner, Adam

at all relevant times, was confined at Potosi Correctional Center ("PCC").  Defendant Griffith was the Warden at PCC;  Defendant Dunn was the Chief of Custody and Safety at PCC; Defendant Hunter was an Assistant Shift Commander at PCC; and Defendant Menteer was the Shift Commander at PCC.

Plaintiff alleges that Defendants violated his Fourteenth and Eighth Amendment rights by implementing and enforcing special security orders against him while he was confined in administrative segregation, as well as by assigning him to a "camera cell" for a period of three weeks.  Defendants move for summary judgment on the grounds that Plaintiff's claims, even if true, neither create a liberty interest to trigger the protections of due process or raise to the level of cruel and unusual punishment.  Alternatively, Defendants assert they are entitled to qualified immunity.

## II.     Legal Standard

Summary judgment is appropriate when no genuine issue of material fact exists in the case and the movant is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The initial burden is placed on the moving party. *City of Mt. Pleasant, Iowa v. Assoc. Elec. Co-op., Inc.*, 838 F.2d 268, 273 (8th Cir. 1988).  If the record demonstrates that no genuine issue of fact is in dispute, the burden then shifts to the non-moving party, who must set forth affirmative evidence and specific facts showing a genuine dispute on that issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  In determining whether summary judgment is appropriate in a particular case, the evidence must be viewed in the light most favorable to the non-moving party. *Osborn v. E.F. Hutton & Co., Inc.*, 853 F.2d 616, 619 (8th Cir. 1988).  Self-

---

Randazzo, Michael Sandberg, Ryan Brooks, and Jeffrey Jones.  The Court also dismissed Plaintiff's official capacity claims against the remaining Defendants.  (Doc. No. 9).

serving, conclusory statements without support are insufficient to defeat summary judgment. *Armour & Co., Inc. v. Inver Grove Heights*, 2 F.3d 276, 279 (8th Cir. 1993).

### III.    Facts[4]

On October 14, 2015, Plaintiff's cellmate, Daniel Wilson, was found unresponsive in their cell. PCC launched an investigation and on December 22, 2015, found Plaintiff guilty of killing Wilson. (Doc. No. 65-6).  PCC referred the case for criminal prosecution and assigned Plaintiff to administrative segregation.   (*Id.* at 2).   Plaintiff would remain in administrative segregation through all of the relevant events henceforth discussed.

About a month after the disciplinary hearing for the murder of his cellmate, Plaintiff attacked another offender.  While being transported from his cell to nurse sick call, Plaintiff kicked a prisoner—who was restrained to a security bench—in the face.  He pleaded guilty to assault and creating a disturbance and waived his rights to a hearing.  (Doc. No. 65-8).  Following this violation, Assistant Shift Commander Jeff Turner placed Plaintiff on a special security order ("SSO") that required Plaintiff to wear leg restraints whenever he was removed from his cell.  The SSO went into effect on January 25, 2016, and stipulated that Plaintiff's "actions and behavior would be evaluated in the next thirty days."  (Doc. No. 67).

A few months later, on May 5, 2016, correctional officer Patrick Brauner and offender Matthew Hoeft approached Plaintiff's cell to pass out laundry.  When Brauner opened the cell

---

[4] Except as otherwise specified, the facts are taken from Defendants' Statement of Uncontroverted Material Facts, (Doc. No. 65 ), to the extent they were admitted or not properly controverted by Plaintiff in his response. *Hinshaw v. Moore*, No. 1:14CV00024 ACL, 2015 WL 6702131, at *2 (E.D. Mo. Nov. 3, 2015), *aff'd*, 666 F. App'x 565 (8th Cir. 2016) ("The movant's statement of facts are deemed admitted if not specifically controverted by the party opposing the motion with specific references to portions of the record as required by Local Rule 4.01(E) and Federal Rule of Civil Procedure 56(C)(1))."). Plaintiff's pro se status does not excuse him from complying with local rules. *See Schooley v. Kennedy*, 712 F.2d 372, 373 (8th Cir. 1983).

door, Plaintiff said, "Here's your piss water, bitch." and then threw an unknown liquid out of the food port, hitting both Brauner and Hoeft.  (Doc. No. 65-9 at 1).  The next day, Plaintiff told Brauner, "I don't give a fuck what you guys do, next time I will throw straight piss on you instead of cut piss water like it was last time.  I have all day to sit here and fuck your lives up, bitch." (Doc. No. 65-10 at 1).  Disciplinary hearings for these incidents were held on May 17 and May 18, 2016.  Plaintiff was found guilty of causing contact with a bodily fluid and threatening Brauner.[5]  (Doc. No. 65-9 at 2; Doc. No. 65-10 at 2).  PCC referred Plaintiff to criminal prosecution for endangering a corrections officer.  (Doc. No. 65-9 at 2).

On August 10, 2016,  correctional officer Steven Brouk conducted a search of Plaintiff's cell. During his search, he found "a prison made weapon made from a clear hard plastic Bic style ink pen flattened on one end . . . to be used as a stabbing device."  After completing his search, Brouk walked by Plaintiff while he was secured to a restraint bench.  Plaintiff told Brouk, "You're lucky you're holding that in your hand bitch, was gonna be in your neck.  I'll have another one before your bitch ass goes home.  You can bet you'll find the next one in your throat bitch, I promise. I'm gonna cut your fucking head off."  (Doc. No. 65-12 at 1).  Later the same day, Brouk interviewed Plaintiff about a conduct violation.  Plaintiff, while in the presence of Brouk and two other correctional officers, began threatening Brouk.  Specifically, Plaintiff said, "I'm gonna catch you slipping one day mother fucker!  I'm gonna beat your fucking brains out bitch.  You've seen what I can do to a motherfucker.  You'll be next!  I promise I'm gonna kill your bitch ass!" (Doc.

---

[5] In Plaintiff's response to Defendants' Statement of Uncontroverted Material Facts, he concedes that he committed the violation on May 5, 2016, but states that he did not threaten Brauner the following day. Instead, he argues that the violation on May 6, 2016,  was concocted as retaliation for his assault on staff the day earlier  (Doc. No. 84 at 7).  Plaintiff's self-serving statement—which is without any factual or other evidentiary support—is insufficient to overcome Defendants' evidence.  *See Conolly v. Clark*, 457 F.3d 872, 876 (8th Cir. 2006) ("[A] properly supported motion for summary judgment is not defeated by self-serving affidavits.").

4

No. 65-11 at 1).  Disciplinary hearings were held for these incidents on August 18, 2016.  (*Id.* at 2; Doc. No. 65-12 at 2).  Plaintiff refused to participate in the hearings and was found guilty of possessing dangerous contraband and threatening Brouk.[6]  (Doc. No. 65-11 at 2; Doc. No. 65-12 at 2).

Following these threats to correctional officers and the discovery of a prison made weapon, Defendant Dunn modified Plaintiff's SSO on August 19, 2016.  The August SSO required that every time Plaintiff left his cell that (1) he would be restrained through the food port, behind the back with hinged handcuffs at the wrists; (2) leg irons would be placed on his arms, just above the elbows, with the chain behind the back; (3) leg irons would be placed on his ankles; and (4) all restraints would be double-locked.  (Doc. No. 67-1).  In his affidavit, Defendant Dunn explained that the August SSO called for leg irons to be used on Plaintiff's arms because he was capable of "contort[ing]" his body in ways that allowed him to harm others when he was in less restrictive restraints.  (Doc. No. 65-3 ¶ 11).  Plaintiff denies that the leg irons were necessary and states that Defendants have provided no evidence of a time that Plaintiff ever contorted his body to harm someone while in handcuffs.  Plaintiff instead asserts that the leg irons were placed on him by Defendants in order to harass him.  (Doc. No. 84 at 8).  Plaintiff filed a grievance at PCC against the SSO's requirement that he wear leg irons on his arms.  His grievance was denied, and the denial was upheld on appeal.  (*Id.* at 4).

While under the August SSO, Plaintiff was found guilty of three additional conduct violations.  The first violation occurred on the morning of October 3, 2016, while Plaintiff was sitting on a

---

[6] Plaintiff concedes that he was found with contraband but denies  threatening Brouk.  Instead, he argues that the threat violation was issued to harass him.  (Doc. No. 84 at 7).  Plaintiff's self-serving statement— which is without any factual or other evidentiary support—is insufficient to overcome Defendants' evidence.  *See Conolly*, 457 F.3d 872 at 876.

restraint bench with another prisoner.  Plaintiff turned and kicked the other prisoner with both feet in the face, knocking him off the bench.  (Doc. No. 65-13 at 1).  A disciplinary hearing was held on October 12, 2016, and Plaintiff was found guilty of assault.  (*Id.* at 2).  The second violation occurred in the evening of November 30, 2016.  One of PCC's nurses was being escorted through the administrative segregation unit when Plaintiff said he would "catch her one night and fuck her arm up."  Plaintiff continued to yell obscenities while the nurse was present, including calling her a "fat bitch."  (Doc. No. 65-14 at 1).  A disciplinary hearing was held on December 6, 2016, and Plaintiff was found guilty of threatening the nurse, creating a disturbance, and engaging in insulting behavior.[7]  (*Id.* at 2).

The third conduct violation under the August SSO occurred shortly after the resolution of Plaintiff's criminal prosecution for the murder of his cellmate.  On January 9, 2017, Plaintiff pleaded guilty to beating and strangling his cellmate to death and was convicted of second-degree murder.  He was sentenced to life in prison.  (Doc. No. 65-7).  About a month later, on February 8, 2017, a PCC correctional officer intercepted a letter Plaintiff had written to his brother.  In the letter, Plaintiff identified two individuals who allegedly participated as witnesses in Plaintiff's murder investigation and who were incarcerated in the same prison as Plaintiff's brother.  Plaintiff told his brother that he learned of the witnesses during discovery and instructed him to leak their names to two other offenders who were members of the same prison gang as Plaintiff and his brother.  According to the incident report, the letter appeared to be an attempt by Plaintiff to "greenlight" a major assault on witnesses in his murder investigation.  (Doc. No. 65-15 at 1).  A

---

[7] Plaintiff denies threatening the nurse; rather, he says that he had a conversation with her "about the refusal of his medication." (Doc. No. 84 at 8). Plaintiff's self-serving statement—which is without any factual or other evidentiary support—is insufficient to overcome Defendants' evidence. *See Conolly*, 457 F.3d 872 at 876.

disciplinary hearing was held on March 8, 2017,[8] and Plaintiff was found guilty of attempted assault.[9]  (*Id.* at 4).

In response to this escalating behavior, Defendant Dunn placed Plaintiff on another revised SSO on February 21, 2017.  The February SSO required that (1) Plaintiff and his cell would be searched at a minimum of one time per shift at random intervals; (2) two officers would be in the *immediate* area when his cell door was opened; (3) before Plaintiff was removed from the cell, he would be handcuffed with hinged handcuffs; (4) leg irons would be placed upon Plaintiff's elbows, with the chain behind his back; (5) and leg irons would be placed on Plaintiff's ankles for the entirety of the time he was outside his cell.  (Doc. No. 67-2).  Plaintiff states that, starting on February 23, 2017, Defendants Hunter and Menteer directed correctional officers to strip search him while he was recorded on video camera.[10]  (Doc. No. 84 at 9).  He further alleges that, during these strip searches, he was required to "squat and cough," grab the bottoms of his feet, and "bounce" his private parts while being visually inspected.  (*Id.*).  Defendants do not clarify who chose the form of the searches but do explain that strip searches were necessary because Plaintiff had a history of hiding dangerous contraband and using correspondence to order violence.  (Doc.

---

[8] The March 8, 2017 disciplinary hearing  was actually the second rehearing of this incident.  The first disciplinary hearing was held on February 27, 2017, but a rehearing was set because the disciplinary action report was missing a signature.  (Doc. No. 65-15 at 2).  The first rehearing was conducted on March 2, 2017, but a second rehearing was set because the disciplinary action report was missing dates, times, and an indication as to whether Plaintiff pleaded guilty at his interview or at the hearing.  (*Id.* at 3).

[9] Plaintiff contends that while he did, in fact, write a letter to his brother, that the letter did not greenlight an assault. He states that this violation is a "fiction" made up by Defendants.  (Doc. No. 84 at 8).  Plaintiff's self-serving statement—which is without any factual or other evidentiary support—is insufficient to overcome Defendants' evidence.  *See Conolly*, 457 F.3d 872 at 876.

[10] Plaintiff asserts that this was in contradiction to the February SSO, which specifically called for him to have pat down, rather than strip, searches.  .  (Doc. No. 84 at 9).   The February SSO, however, does not specify how the searches were to be conducted.

No. 65 ¶ 20).  Defendants neither confirm nor deny that Plaintiff was recorded during these searches.

On February 28, 2017, Plaintiff was moved into a camera cell where he was under constant surveillance.  (Doc. No. 79).  Plaintiff alleges that he was never told why he was moved into the camera cell.  (Doc. No. 84 at 9).  Although Defendants do not specify why Plaintiff was placed in the cell, Defendants do explain that a camera cell may be used for a short period of time to house an offender who is an ongoing danger to other inmates, himself, or prison staff.  (Doc. No 65 ¶ 22).  Plaintiff was removed from the camera cell on March 21, 2017, and returned to his original cell in administrative segregation.  (Doc. No. 79).

 Plaintiff filed a grievance with PCC wherein he argued that the February SSO's directives were unconstitutional.  The grievance was denied.  Plaintiff appealed the decision on July 2, 2017, and on August 8, 2017, he was notified by the Missouri Department of Corrections ("MDOC") that his appeal was likewise denied.  The MDOC explained that the SSO was issued for safety and security reasons given Plaintiff's several conduct violations and stated that Plaintiff had failed to provide any evidence that the SSO was unjustified.  (Doc. No. 84 at 5).

Plaintiff states that he remained on the February SSO from February 21, 2017, to November 22, 2017—a period of about nine months.  (*Id.* at 7).  During that time, he maintains that he was subjected to recorded strip and cell searches three times a day.  Plaintiff claims that during these searches he was exposed to verbal harassment and that his property was violently disheveled, but he does not specify what was said to him or if any of his property was damaged.  (*Id.* at 2).  Plaintiff was not found guilty of any conduct violation that occurred while the February SSO was in effect.

### IV.   Discussion

### A.  Due Process Claim

#### 1.   Liberty Interest

"In order to prevail on a Fourteenth Amendment due process claim, [Plaintiff] must first demonstrate that he was deprived of life, liberty, or property by government action." *Phillips v. Norris*, 320 F.3d 844, 846 (8th Cir. 2003).  Plaintiff does not allege that he was denied of life or property, so he must identify a liberty interest to maintain his due process claim. *Id.* at 847.  In *Sandin v. Conner*, the Supreme Court found that Prisoners have a liberty interest, protected by the Due Process Clause, in avoiding conditions of confinement that impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." 515 U.S. 472, 484 (1995).  There is no bright-line rule as to what constitutes an atypical and significant hardship. *Smith v. McKinney*, 954 F.3d 1075, 1081 (8th Cir. 2020) ("The Supreme Court has acknowledged 'the difficulty of locating the appropriate baseline' by which to measure what constitutes an atypical and significant hardship, but it has not resolved the issue." (quoting *Wilkinson v. Austin*, 545 U.S. 209, 223 (2005))).  However, courts should consider both "[t]he duration and degree of restrictions" to determine "whether a change in conditions imposes such a hardship." *Id.* at 1080 (quoting *Hamner v. Burls*, 937 F.3d 1171, 1180 (8th Cir. 2019), *as amended* (Nov. 26, 2019)).

Plaintiff does not argue that his placement or continued confinement in administrative segregation violated his due process rights.  Rather, Plaintiff argues that Defendants Cindy Griffith and Greg Dunn violated his Fourteenth Amendment right by assigning him to a camera cell "without cause" and by depriving him of "due process before the issuance and continuation" of the SSOs.  Plaintiff does not identify what process he believes he was entitled to before the issuance

9

of the security orders or his movement to a camera cell. He does specify, however, that he was entitled to a periodic examination of the SSOs because "Defendants clearly stated [he] was to receive a review every 30 days to determine the need for such security measures." (Doc. No. 84 at 13). Defendants' alleged obligation to perform a review appears to be derived from the first SSO that was issued for Plaintiff, which stipulated that his actions and behaviors would be evaluated in thirty-days.

To the extent Plaintiff is claiming a due process violation because he was denied a specific review procedure—whether that be a hearing before the changes in his confinement or an ongoing thirty-day review of the SSO's justification—his argument is misguided. Plaintiff does not have a liberty interest in the procedures by which the State believes it can best determine how he should be confined. *Phillips*, 320 F.3d at 847; *see also Olim v. Wakinekona*, 461 U.S. 238, 250 (1983) ("Process is not an end in itself. Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement."); *Griffin-El v. Delo*, 34 F.3d 602, 604 n.3 (8th Cir. 1994) (inmate does not have a liberty interest in a specific procedure).

Plaintiff does, however, have a liberty interest in the nature of his confinement and has identified three changes to his incarceration that he alleges were "atypical and significant": (1) his placement in a camera cell for a period of three weeks; (2) the use of leg irons to restrain his arms when he was transported outside of his cell; and (3) the thrice-daily searches of his cell and his person.

### *Placement in Camera Cell*

Plaintiff fails to demonstrate Defendants violated his due process rights when they assigned and confined him to a camera cell because prisoners do not have a liberty interest in their assignment to a particular housing unit. *See Skinner v. Reed*, No. 07-4160-CV-C-NKL, 2008 WL

141669, at *2 (W.D. Mo. Jan. 11, 2008) (citing *Moorman v. Thalacker*, 83 F.3d 970, 973 (8th Cir. 1996)) (dismissing prisoner's due process claims regarding his assignment to a suicide cell). Further, Plaintiff's confinement to the camera cell was not unduly long; Plaintiff was moved into a camera cell on February 28, 2017 and remained there until March 21, 2017. Confinement to a more restricted housing unit for twenty-one days is not an atypical and significant hardship. *See Stewart v. Holder*, No. 1:18-CV-13-JAR, 2018 WL 3079704, at *2 (E.D. Mo. June 20, 2018) (thirty days in a suicide camera cell was not unduly long enough to create a liberty interest); *see also Wycoff v. Nichols*, 94 F.3d 1187, 1190 (8th Cir. 1996) (no atypical and significant hardship where inmate spent ten days in disciplinary detention and 100 days in maximum-security cell); *Moorman*, 83 F.3d at 973 (no atypical and significant hardship where inmate spent fifteen days in highest-level disciplinary detention and 107 days of less-restrictive disciplinary detention). As a result, Plaintiff fails to identify a valid liberty interest necessary to maintain a due process claim premised on his assignment to a camera cell.

### *Leg Irons*

Plaintiff similarly fails to establish that he had a liberty interest in being free from leg irons being used to restrain his arms when he was transported out of his cell. Plaintiff does not have a liberty interest in being free from restraints. *Gibson v. Rosati*, No. 9:13-CV-503-GLSTWD, 2017 WL 1534891, at *18 (N.D.N.Y. Mar. 10, 2017), *adopted by*, No. 9:13-CV-503, 2017 WL 1512371 (N.D.N.Y. Apr. 27, 2017) ("Plaintiff argues the 'indefinite restraint order' violated his due process rights . . . . However, 'inmates do not have a liberty interest in being free from restraints while out of their cell." (quoting *Walker v. LaValley*, No. 9:12-CV-807 (TJM/CFH), 2014 WL 4744735, at *19 (N.D.N.Y. Sept. 23, 2014))). This is because "[r]estraints are an 'expected adverse consequence of confinement' and thus "not an atypical and significant hardship in prison life."

*Alston v. Daniels*, No. 3:15-CV-669 (CSH), 2015 WL 7257896, at *8 (D. Conn. Nov. 17, 2015)

(quoting *Grinter v. Knight*, 532 F.3d 567, 574 (6th Cir. 2008)).  In fact, the Missouri Department

of Corrections Procedure Manual ("the MDOC Manual"), expressly grants prison officials the

flexibility to select the type of restraints required to safely transport a prisoner given that prisoner's

behavioral history.  (Doc. No. 67-4 at 5).  Recognizing Plaintiff's long history of violent and

threatening conduct, the Court believes the use of leg irons to be a perfectly reasonable restraint to

maintain prison safety.  Plaintiff has provided no authority in support of his claim that a prisoner

with a similar history has a liberty interest in a more lenient set of restraints.  The Court concludes

that neither wearing leg irons out of his cell for approximately fifteen months nor the allegation

that the leg irons "pinch[ed] and cut[] into [Plaintiff's] skin" is an "atypical and significant

hardship" that would create a liberty interest sufficient to support a Fourteenth Amendment due

process claim.  *See Gulley v. Semple*, No. 3:18CV2140 (SRU), 2020 WL 423401, at *5 (D. Conn.

Jan. 27, 2020) (finding no atypical and significant hardship when prisoner suffered pain in

shoulders and back from being handcuffed behind his back); *Davis v. Spencer*, No.

515CV00105KGBPSH, 2017 WL 1156741, at *5 (E.D. Ark. Mar. 28, 2017) (finding no atypical

and significant hardship when prisoner was not permitted to leave his cell without wearing

handcuffs and shackles for twenty-two months);  *Herron v. Elkins*, No. 4:06CV627 (CDP), 2006

WL 1876967, at *2 (E.D. Mo. July 5, 2006) (finding no atypical and significant hardship when

arthritic prisoner experienced pain from being restrained whenever he was taken out of his cell).

As a result, Plaintiff cannot maintain a due process claim premised on PCC's use of leg irons.

### Cell and Strip Searches

Finally, Plaintiff cannot establish that the daily cell and strip searches violated his due process

rights; Plaintiff does not have a liberty interest in being free from cell searches because such

searches are an ordinary occurrence in prison life.  *See Banks v. Beard*, No. 2:03CV659, 2006 WL 2192015, at *16 (W.D. Pa. Aug. 1, 2006) (prisoner "possesses no liberty interest in being free from cell searches").  Although the searches happened three times daily for nine months, confinement restrictions of longer durations have been found to be insufficient to create a liberty interest.  *See, e.g.*, *Bunch v. Long*, No. 06-4204-CV-C-NKL, 2008 WL 5082861, at *4 (W.D. Mo. Nov. 24, 2008) (more restrictive confinement in administrative segregation for period of twenty-two months did not create a liberty interest).  Plaintiff has also not provided any evidence the searches were conducted in a way to that was particularly onerous. Plaintiff identifies no specific harm he suffered as a result of these searches other than that "some" of the searches "resulted in the violent dishevelment of his cell and property."  Recognizing that the searches occurred for a period of less than a year and that the only harm Plaintiff has identified is the occasional dishevelment of his property, the Court is unpersuaded that the cell searches create a deprivation significant enough to create a liberty interest.

Similar to cell searches, Plaintiff does not have a liberty interest to be free from strip searches. *See Samford v. Staples*, 249 F. App'x 1001, 1004 (5th Cir. 2007) (no liberty interest in being free from strip searches generally).  This is because strip searches, although invasive, are a routine safety measure in the context of prison life.  *Bros. v. Lawrence Cty. Prison Bd.*, No. CIV.A. 06-1285, 2008 WL 146828, at *11 (W.D. Pa. Jan. 14, 2008) (finding no liberty interest because "strip searches are all too routine an occurrence in jails and prison" to be an "atypical and significant hardship").  Specifically, prison officials regularly use strip searches as a way to discover contraband that could otherwise be used to harm prison staff or other offenders.  *See  Story v. Foote*, 782 F.3d 968, 971 (8th Cir. 2015) (acknowledging that visual body-cavity inspections support the "essential goal" of "preserving internal order" by deterring the smuggling of

contraband (quoting *Bell v. Wolfish*, 441 U.S. 520, 599 (1979))). The MDOC, for example, allows for strip searches when a security order has been issued for a prisoner who has a history of keeping dangerous contraband.  (Doc. No. 65 ¶ 20).  MDOC's policy is especially relevant here, where Plaintiff was able to both fashion (or come into possession of) a prison made weapon and author correspondence with the intent to direct the harm of other offenders, despite being in segregation. Given Plaintiff's history of contraband and escalating violent behavior, the fact that he was subjected to strip searches does not strike the Court as unusual or extraordinary in the context of prison life.  *See Shields v. Lambert*, No. 4:16CV1295 CEJ, 2016 WL 6138648, at *3 (E.D. Mo. Oct. 21, 2016) (a prisoner has a liberty interest only if he "demonstrates 'extraordinary circumstances'" (quoting *Sandin*, 515 U.S. at 484-86 (1995))).

    The fact that Plaintiff was subjected to frequent searches does not change the Court's position. *See Waller v. Maples*, No. 1:11CV00053 JLH-BD, 2011 WL 3861370, at *4 (E.D. Ark. July 26, 2011), *adopted by*, No. 1:11CV00053 JLH-BD, 2011 WL 3861369 (E.D. Ark. Aug. 31, 2011) (daily shakedown and strip searches, in addition to other deprivations during thirty days in punitive segregation, were not an "atypical and significant hardship"); *see also James v. Jackson*, No. 2:14-CV-0225, 2015 WL 927074, at *1-2 (N.D. Tex. Mar. 4, 2015) (plaintiff's claim that he was strip searched "over one hundred [times] . . . in less than 25 days" even though "no contraband was ever found" did not amount to an atypical and significant hardship).  Nor does the fact that Plaintiff was recorded during these searches.  Plaintiff has provided no authority that the introduction of a camera elevates a strip search to the level of a significant hardship, nor has he provided evidence that the use of a camera during a strip search is atypical.  Under the circumstances of this case, the Court does not find that the monitoring of Plaintiff's strip searches establishes the extraordinary circumstances necessary to entitle him to due process.

14

For the above reasons, the Court finds that the changes in Plaintiff's conditions of confinement, individually, and taken together, do not rise to the level of an "atypical and significant hardship in relation to the ordinary incidents of prison life." Therefore, Plaintiff has not identified a liberty interest, and Defendants Griffith and Dunn are entitled to summary judgment on Plaintiff's Fourteenth Amendment claims.

### 2. Qualified Immunity

Even if Plaintiff did have a liberty interest in avoiding the specified conditions of his confinement, and Defendants had violated his rights to due process, Defendants Griffith and Dunn would be entitled to qualified immunity. "Qualified immunity shields government officials from liability in a § 1983 action unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known." *De Boise v. Taser Int'l, Inc.*, 760 F.3d 892, 896 (8th Cir. 2014) (quoting *Brown v. City of Golden Valley*, 574 F.3d 491, 495 (8th Cir. 2009)). A two-pronged test determines whether officials are entitled to immunity. First, "a court must decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Second, "the court must decide whether the right at issue was clearly established at the time of defendant's alleged misconduct." *Id.* (quotation marks and citations omitted). In order for a right to be clearly established, "'existing precedent must have placed the statutory or constitutional question' confronted by the official 'beyond debate.'" *Martin v. Hurley*, No. 2:13-CV-00048-SPM, 2015 WL 6750808, at *3 (E.D. Mo. Nov. 5, 2015) (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)). "If either prong is not satisfied, qualified immunity applies." *Id.* (quoting *Pearson*, 555 U.S. at 236).

As already discussed, Plaintiff cannot show that Defendants violated his constitutional rights. On that basis alone, Griffith and Dunn are entitled to qualified immunity. Further, Plaintiff cannot satisfy the second prong; he has cited no Eighth Circuit cases finding that similar facts posed an atypical and significant hardship, and the Court has found none. In light of the case law, which is highly fact-specific and in short supply of bright-lines, the Court does not believe that the constitutional question that Defendants faced in determining appropriate confinement measures for Plaintiff was "beyond debate." *Hamner*, 937 F.3d at 1180 (finding defendants entitled to qualified immunity even though "it is possible" that the case's "combination of circumstances . . . could curtail a liberty interest" because "in this fact specific-area . . . it is not beyond debate that the defendant officials did so" (internal citations omitted)); *see also Perry v. Spencer*, 751 F. App'x 7, 10-11 (1st Cir. 2018) ("Given the varying approaches to measuring atypicality and the absence of any bright-line rule or consensus as to what combination of conditions and duration of confinement in administrative segregation was sufficient to implicate a liberty interest and trigger due process, or at what point that interest arose, the contours of the liberty interest were not sufficiently defined as to place the constitutional question 'beyond debate[.]'" (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015))). Accordingly, there was no violation of a "clearly established" right, and Defendants are entitled to qualified immunity on Plaintiff's due process claims.

## B.  Eighth Amendment

The Eighth Amendment protects incarcerated prisoners from cruel and unusual punishment and requires prison officials to provide humane conditions of confinement. *Hemingway v. McSpadden*, No. 1:17 CV 50 (JMB), 2018 WL 5885512, at *4 (E.D. Mo. Nov. 9, 2018) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). The Constitution does not, however, "mandate

comfortable prisons"; rather, the Eighth Amendment is triggered only upon a finding of "'extreme deprivations' that deny 'the minimal civilized measure of life's necessities." *Jones v. Crews*, No. 4:19-CV-1186 CDP, 2020 WL 1433638, at *15 (E.D. Mo. Mar. 24, 2020) (quoting *Rhodes v. Chapman*, 492 U.S. 337, 349 (1981); then quoting *Hudson v. McMillian*, 503 U.S. 1, 9 (1992)); *see Hemingway*, 2018 WL 5885512, at *4  ("[T]he risk that the prison complains of [must] be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." (quoting  *Helling v. McKinney*, 509 U.S. 25, 36 (1993))).

To prove an Eighth Amendment conditions-of-confinement claim, the plaintiff must first provide proof that the conditions "were objectively, sufficiently serious" to amount to "the denial of 'the minimal civilized measure of life's necessities."  *Wines v. Babb*, No. 1:14CV00144-JLH-JTK, 2015 WL 136542, at *2 (E.D. Ark. Jan. 9, 2015) (quoting *Farmer*, 511 U.S. at 834).  Second, the plaintiff must provide proof that the prison officials "were deliberately indifferent to a serious risk of harm to the inmate."  *Hemingway*, 2018 WL 5885512, at *4.  "A prison official is deliberately indifferent if he 'knows of and disregards' a substantial risk of serious harm to an inmate."  *Reynolds v. Dormire*, 636 F.3d 976, 979 (8th Cir. 2011) (quoting *Farmer*, 511 U.S. at 837).

Plaintiff has alleged that the conditions of his confinement at PCC violated his Eighth Amendment Rights.  These conditions, as discussed above, are: (1) his placement in a camera cell for a period of three weeks; (2) the use of leg irons to restrain his arms when he was transported outside of his cell; and (3) the thrice-daily searches of his cell and his person.  Each is discussed in turn.

### *Camera Cell*

Plaintiff argues that defendants violated his Eighth Amendment rights by placing him in a "suicide observation" cell for a period of three weeks.  Plaintiff's sole complaint about the cell was that it subjected him to constant surveillance, thereby causing him humiliation and embarrassment. Although being placed under video surveillance could be understood as "harsh or uncomfortable," the circumstances Plaintiff describes do not rise to the level of depriving him of one or more basic life necessities.  *See Ewing v. Wallace*, No. 1:13CV71 LMB, 2014 WL 495441, at *3 (E.D. Mo. Feb. 6, 2014) (no Eighth Amendment violation where prisoner was placed in suicide cell because he was not deprived of "any of life's necessities"); *Skinner*, 2008 WL 141669, at *2 (same). Because Plaintiff has failed to show that his placement in a camera cell was "objectively, sufficiently serious," he cannot prove an Eighth Amendment violation on these facts.

### *Leg Irons*

Plaintiff next argues that the use of leg irons to restrain his arms for approximately fifteen months whenever he left his cell violated his Eighth Amendment rights.  Although this measure may appear harsh on its face, restraints do not violate the Constitution unless their use was "so unreasonable or excessive as to be clearly disproportionate" to the needs of prison officials in maintaining security and order.  *See Jones v. Mabry*, 723 F.2d 590, 596 (8th Cir. 1983); *Hawkins v. Byrd*, No. 408CV01791WRWBD, 2009 WL 1313269, at *4 (E.D. Ark. May 12, 2009) ("Restraints  on an inmate do not violate the [Eighth] amendment unless they are 'totally without penological justification,' 'grossly disproportionate,' or 'involve the unnecessary and wanton infliction of pain." (quoting *Smith v. Coughlin*, 748 F.2d 783, 787 (2d Cir.1984))).  Here, Plaintiff was subjected to leg irons only after he committed several alarming conduct violations, which included murdering his cellmate, threatening and assaulting prison staff and other offenders, and

18

hiding a prison-made weapon.  Defendants did not enact this safety measure after Plaintiff's first offense; rather, they instituted this precaution only after Plaintiff showed a continued disregard for the safety and well-being of others at PCC.  Although Plaintiff complains that the leg irons were unnecessary to restrain him and that they cut into his skin, the Court is not persuaded that the restraint measure was "so unreasonable or excessive" in light of the immense safety concern he presented to those around him.  Accordingly, Plaintiff fails to make a showing that his Eighth Amendment right was violated through the use of these restraints.

### Cell and Strip Searches

Plaintiff also argues that the nine months of daily, once-per-shift searches of his cell and person were unconstitutional under the Eighth Amendment.

As a general rule, "cell searches are permissible in prison and [] prisoners do not have a legitimate expectation of privacy in their prison cells." *Love v. Price*, No. 4:18CV1595 SPM, 2019 WL 918284, at *7 (E.D. Mo. Feb. 25, 2019).  Yet, cell searches can violate the Eighth Amendment if they are frequent and retaliatory.  *See Scher v. Engelke*, 943 F.2d 921, 924-25 (8th Cir. 1991) (Eighth Amendment protects against "misery inflicted through frequent retaliatory cell searches"). Here, Plaintiff was undoubtedly subjected to frequent cell searches. *See id.* (finding that ten searches in nineteen days was "frequent").  However, Plaintiff has not provided any evidence, other than his bald assertion, that these cell searches were conducted out of retaliatory animus.[11] To the contrary, Defendants have provided evidence that Plaintiff hid a prison-made weapon in his cell and had written a letter with the intent to cause harm to witnesses in his murder

---

[11] Comparatively, the Eighth Circuit in *Scher* found evidence of retaliatory motive where (1) plaintiff had reported a correctional officer for attempting to obtain illicit weapons; (2) the correctional officer was forced to resign his position; (3) following the resignation, plaintiff was subjected to several searches and had noncontraband items confiscated; (4) and the officer who conducted the searches testified he had no reason to believe that plaintiff had contraband in his cell.

investigation.   This evidence, along with the numerous other violent conduct violations, demonstrates that these searches were motivated by the valid penological interest of deterring a recalcitrant prisoner's possession of contraband.   Accordingly, the searches of Plaintiff's cell do not rise to the level of an Eighth Amendment violation.   *See Love*, 2019 WL 918284, at *7 (dismissing Eighth Amendment violation claim where plaintiff was subjected to daily cell searches, in part, because there were no facts supporting a retaliatory motive).

The Eighth Amendment also protects against strip-searches that amount to "calculated harassment" or that are "maliciously motivated."  *See Lindsey v. Tom*, No. 16-CV-613-JDP, 2018 WL 1583039, at *3 (W.D. Wis. Mar. 30, 2018) (quoting *Whitman v. Nesic*, 368 F.3d 931, 934 (7th Cir. 2004)).   However, when strip searches are conducted according to legitimate safety concerns, they do not create a sufficiently serious deprivation to trigger the Eighth Amendment.  *Franklin v. Lockhart*, 883 F.2d 654, 657 (8th Cir. 1989)  (finding that twice-daily visual cavity searches did not violate the Eighth Amendment because prison official had "legitimate security concerns" and there was "no substantial evidence that the manner of the search [was] an 'exaggerated response'" (quoting *Goff v. Nix*, 803 F.2d 358, 362-63 (8th Cir. 1986))).   Here, the Court recognizes the Plaintiff underwent frequent, invasive strip searches under the February SSO.   Yet, the record shows that these searches were the direct consequence of Plaintiff's numerous and violent conduct violations.   Because the strip searches  were implemented due to a legitimate safety concern that Plaintiff would use dangerous contraband to harm others, the Court finds that the strip searches did not amount to an Eighth Amendment violation.   The fact that Plaintiff alleges unspecified verbal harassment does not change the Court's position.  *See Gettridge v. Jackson Par. Corr. Ctr.*, No. 3:12-CV-3148, 2013 WL 1180919, at *3 (W.D. La. Feb. 19, 2013) *adopted by*, No. CIV.A. 12-3148, 2013 WL 1180917 (W.D. La. Mar. 20, 2013) (verbal abuse, ridicule, and veiled threats

during strip search did not state an actionable claim under § 1983).  Nor does the fact that the strip

searches were videotaped.  *See Fatir v. Phelps*, No. CV 18-933-CFC, 2019 WL 2162720, at *6

(D. Del. May 17, 2019) (video recording or allowing a live camera feed of a strip search does not,

by itself, render the searches in violation of the Eighth Amendment); *cf. Story*, 782 F.3d at 972

(video surveillance of  strip searches did not violate plaintiff's clearly established Fourth

Amendment right).

The Court also notes that upon first review of Plaintiff's complaint, it inferred that—in

addition to his Eighth Amendment claims—he was also making a Fourth Amendment claim

challenging the reasonableness of the strip searches.  Accordingly, the Court allowed for Plaintiff

to proceed with a Fourth Amendment claim against Defendants Menteer and Hunter (who,

according to Plaintiff, instituted the strip searches under the February SSO).  Following the initial

review, however, Plaintiff has not referenced or made any argument advancing a Fourth

Amendment claim.  The summary judgment briefing from both parties likewise fails to specifically

argue about the constitutionality of the strip searches from a Fourth Amendment lens.

Even without specific briefing on this issue, the Court is satisfied that any Fourth

Amendment claim would also fail.  The Eighth Circuit in *Franklin* held that twice-daily strip

searches of inmates who were dangerous, "repeat[] rule violators" did not violate either the Eighth

*or Fourth* Amendments because the searches were justified by legitimate safety concerns.  883

F.2d  at 656-57 ("Where there is no substantial evidence that the manner of the search is an

'exaggerated response to the perceived security concerns,' however, we must give wide-ranging

deference to prison officials on matters concerning institutional security." (quoting *Goff*, 803 F.2d

at 363-63)).  The undisputed facts in this case prove that Plaintiff was a dangerous, repeat rule

violator with a history of storing contraband.  Nothing in the record suggests that the searches of

21

Plaintiff were motivated by anything other than a legitimate interest in keeping prison staff and other offenders safe or that these searches could have been conducted in a different way that would not compromise security concerns.  Thus, under the specific facts of this case, the strip searches of Plaintiff were reasonable and did not violate the Fourth Amendment.

V.      **Conclusion**

For these reasons, the Court finds and concludes that Defendants are entitled to summary judgment on Plaintiff's claims.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants  Cindy Griffith, Greg Dunn, Rick Menteer, and Will Hunter's Motion for Summary Judgement is **GRANTED**.  (Doc. No. 53).  A separate Judgement will accompany this Memorandum and Order.

Dated this 27th day of May, 2020.

_____
**JOHN A. ROSS**
**UNITED STATES DISTRICT JUDGE**